# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MONTANA

# BILLINGS DIVISION

| | |
|---|---|
| CROW TRIBE OF INDIANS, WESTMORELAND RESOURCES INC., and ABSALOKA COAL LLC., | CV 10-95-BLG-CSO |
| Plaintiffs, | **ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT and SETTING STATUS CONFERENCE** |
| vs. | |
| DANIEL PETERS, as Personal Representative of the Estate of Pauline Peters, | |
| Defendant. | |

Plaintiffs Crow Tribe of Indians, Westmoreland Resources Inc., and Absaloka Coal LLC  [collectively Westmoreland] initiated this action against Daniel Peters, as the personal representative of the estate of Pauline Peters [Peters], alleging illegal interference with

Westmoreland's rights, as mineral lessee, to use the surface of Peters' land. Upon the parties' consent, the case was assigned to the undersigned for all purposes. *Court Doc. 8.* This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1362.

Currently pending are the parties' cross motions for partial summary judgment. Based on the following analysis, Peters' motion will be denied and Westmoreland's motion will be granted in part.

## I. BACKGROUND

Peters is the current owner of the surface estate in lands specifically described as follows: <u>Township 1 South, Range 38 East, M.P.M. Big Horn County, Montana</u>: Section 17 - S½S½N½, S½N½S½N½, S½N½N½S½N½, N½N½S½, and N½S½N½S½, comprising 260 acres, more or less ["Property"]. *Court Doc. 36-3.* The Property is located within the territory described in the Fort Laramie Treaty of May 7, 1868, 15 Stat. 650, and is within the exterior boundaries of the Crow Indian Reservation. *Court Docs. 36 at 2-3, ¶ 2; 45 at 2, ¶ 2;*

In 1925, the United States issued a fee simple patent to Peters' predecessor in interest, Lois Bompart. *Court Doc. 36-1.* The patent

contained the following reservation: "Also reserving to the United States for the benefit of the Crow Tribe, in accordance with the provisions of the Act of Congress of June 4, 1920 (41 Stat., 751), all the coal, oil, gas, or other mineral deposits in the lands above described." The Act provided that allotments "may be made of lands classified as chiefly valuable for coal and other minerals which may be patented as herein provided with a reservation, set forth in the patent, of the coal, oil, gas, or other mineral deposits for the benefit of the Crow Tribe...." 41 Stat. 753. More generally, the Act provided that any and all minerals "on any of the lands to be allotted hereunder are reserved for the benefit of the members of the tribe in common and may be leased for mining purposes upon the request of the tribal council under such rules, regulations, and conditions as the Secretary of the Interior may prescribe...." *Id.* *See also* Act of Congress of May 17, 1968, 82 Stat. 123, Pub.L. 90-308.

Pursuant to the terms of the Indian Mineral Development Act of 1982, 25 U.S.C. § 2101 *et seq.,* the Crow Tribe leased to Westmoreland Resources, Inc., the coal, and the right to mine and remove the coal, from lands including the Property. *See Court Doc. 36-4 at 9.* The lease

expressly granted to Westmoreland "the use of the surface and the subsurface overlying ... the Leased Premises." *Id.* Westmoreland subleased to Absaloka Coal LLC the right to mine and remove the coal in and under the Property. *See Court Doc. 36-4, ¶ 4.* The lease and sublease were approved by the United States Department of the Interior. *Court Doc. 36-4 at 20-21.* The lease was also approved by the Crow Tribe. *Court Doc. 36 at 4, ¶ 9.* According to the affidavit of the Chairman of the Crow Nation Executive Branch, Crow Tribe of Montana, "the Absaloka Mine is critical to the Crow Nation's financial independence now, over the past 37 years, and well into the future." *Court Doc. 36-5 at ¶ 7.*

The Property is included in what Westmoreland refers to as the "South Extension." *Court Doc. 36 at 5 ¶ 16.* The South Extension occupies about 3,300 acres within the Crow Reservation and consists entirely of Crow-owned coal leased to Westmoreland. Westmoreland, which has long mined coal owned by the Crow Tribe, is currently conducting open pit coal mining in the South Extension and expects to reach the Property within four to five years. *Id. at ¶¶ 11, 16.*

Westmoreland estimates that: (1) the process of overburden removal, coal removal, recontouring, topsoiling, and planting for the Property will take five to seven years; (2) that the land will be restored to prior grazing capacity about eight to ten years after mining commences; and (3) the land will be released back to the owner after about fifteen to twenty years, following release of reclamation bonds. *Id*. at 6-7, ¶ 18. It estimates that approximately 5.2 million tons of minable coal underlies the Property, at a value "well in excess of $15 million." *Id*. at 7, ¶ 19. If the Property is not mined, this coal will be isolated and uneconomical to mine, and thus lose its value to the owners, including the Crow Tribe. *Id*. at 10, ¶ 25.

Peters does not consent to open pit coal mining at his Property and contends that Westmoreland may not proceed without his written consent. *Court Docs. 39, 40.*

## II.  PARTIES' ARGUMENTS

### A. Westmoreland's Arguments

Westmoreland makes four arguments in support of its summary judgment motion. First, Westmoreland contends that the mineral

estate, owned by the United States in trust for the Crow Tribe, includes the right to mine the surface estate held by Peters. *Id. at 7-12.*

Second, Westmoreland asserts that the Surface Mining Control and Reclamation Act of 1977 [SMCRA], 30 U.S.C. § 1304, is the applicable federal statute and does not require surface-owner consent on Indian lands. *Id. at 12-15.* Specifically, Westmoreland points to 30 U.S.C. § 1304(f), which excepts Indian lands from the statute's requirement of surface-owner consent. *Id. at 12.*

Third, Westmoreland argues that, although federal law should be deemed conclusive, Montana law also grants Westmoreland the right to a reasonable use of Peters' surface estate, as an incident to its mineral interest. *Id. at 15-19.* Fourth, Westmoreland asserts that surface owner consent to post-mining land use is not required. *Id. at 19-21.*

Although asserting that a mineral owner has no obligation (absent an express statute or deed provision) to compensate the surface owner, Westmoreland agrees that it will pay Peters a reasonable amount for damage and loss of use in an amount to be determined by the Court. Westmoreland contends that this amount should not exceed the fair market value of the surface disturbed. *Id. at 21-24.*

### B. Peters' Arguments

First, Peters argues that federal law requires Westmoreland to obtain surface owner consent before the Office of Surface Mining Reclamation and Enforcement [OSM] may issue a mining permit. *Id.* at 4-7. As support for this position, Peters cites SMCRA and 30 C.F.R. § 778.15(b)(1) -(3).

Second, Peters asserts that the Crow Tribe lacks the regulatory authority to force him to allow the Tribe to mine coal. *Id.* at 7-9. He contends that, under *Montana v. United States,* 450 U.S. 544, 565 (1981), the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the Tribe, with exceptions not here applicable.

Third, Peters claims that the present suit is not yet ripe for judicial review. *Id.* at 9-13. Peters suggests that Westmoreland has not exhausted administrative remedies because it has not obtained his permission or a conveyance to allow it to surface mine. Peters also argues that Westmoreland must appeal OSM's decision to the Interior Board of Land Appeals ("IBLA") before seeking judicial review.

Fourth, Peters argues that Westmoreland must either meet the requirements of 30 C.F.R. 778.15(b)(1) or (2) (surface owner consent or express written grant to surface mine), or Westmoreland must show that these regulations are illegal or unconstitutional. *Id.* at 14. Peters maintains that Westmoreland must either meet the requirements of that regulation or challenge its legality and constitutionality. *Id.* at 14. Peters cites several United States Supreme Court cases, however, to show that the regulation has been found constitutional. *Id.* at 15-16.

Finally, although Peters suggests that Montana law may apply, he does not present any arguments on the substance of Montana law as it relates to these issues. *Id.* at 16.

## III.     LEGAL STANDARD

The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party.  *Id.*

## IV.      DISCUSSION

This case involves a dispute over property rights.  It highlights the tensions between the rights of a surface owner and the rights of a severed mineral interest owner.  The issue arises in the specific context of severed minerals owned by the United States for the benefit of an Indian tribe and within the boundaries of its reservation.

The essential facts are not disputed.  The parties agree on the location of the Property, its ownership history, the validity of Westmoreland's lease, and the lack of Peters' consent.  *Compare Court Doc. 35* at 2-6 *and Court Doc. 38* at 2-3; *see also Court Doc. 36*; *Court Doc. 39.*  The issue here is legal: whether surface owner consent is required prior to open pit mining at the Property.  For the following reasons, the Court concludes that it is not required.

## A.    Federal Law Applies

The Court first must determine what law applies.  This case is
analogous to *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 670 (1979)*,*
in which the Court held:

> Here, we are not dealing with land titles merely derived
> from a federal grant, but with land with respect to which the
> United States has never yielded title or terminated its
> interest. ... The United States continues to hold the
> reservation lands in trust for the Tribe....  In these
> circumstances, where the Government has never parted with
> title and its interest in the property continues, the Indians'
> right to the property depends on federal law....  It is
> rudimentary that "Indian title is a matter of federal law....

*Id.* (citing *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 677
(1974).  *See also Oregon ex rel. State Land Board v. Corvallis Sand &
Gravel Co.,* 429 U.S. 363, 377 (1977) (*quoting Wilcox v. Jackson,* 38 U.S.
498, 517 (1839) ("We hold the true principle to be this, that whenever
the question in any Court, state or federal, is whether a title to land
which had once been the property of the United States has passed, that
question must be resolved by the laws of the United States....")).
Therefore, because the United States holds title to the minerals for the
benefit of the Crow Tribe, federal law controls.

## B. Applicable Statutes

Peters' rights are derived from the patent issued to his predecessors in interest. Patents are to be given effect according to the laws and regulations under which they were issued. *Swendig v. Washington Water Power Co.,* 265 U.S. 322, 332 (1924). Because neither the patent nor the statute pursuant to which it was issued expressly addresses the mineral owner's use of the surface, the Court looks to rules of statutory construction for guidance.

In construing a statute, a court may with propriety consider the history of the times when it was passed. *Great Northern R. Co. v. United States,* 315 U.S. 262, 273 (1942). Subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject. *Id. at* 277.

In addition to these general rules of statutory construction, the court must be mindful of rules that apply to interpreting statutes applicable to property interests of the United States and Indian tribes. A court must interpret any ambiguities in a grant by the United States in the government's favor. *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 59 (1983) (quoting *United States v. Union Pac. R.R. Co.*, 353 U.S. 112,

116 (1957) ("It is an 'established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the government, not against it.' ").

A court must also interpret statutes in favor of tribal interests:

> The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. ... [T]he Court has held that congressional intent to extinguish Indian title must be "plain and unambiguous," and will not be "lightly implied." Relying on the strong policy of the United States "from the beginning to respect the Indian right of occupancy," the Court concluded that it "[c]ertainly" would require "plain and unambiguous action to deprive the [Indians] of the benefits of that policy."

*Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985) (internal citations omitted). In *Lyon v. Gila River Indian Community*, 626 F.3d 1059, 1068 (9th Cir. 2010), the Ninth Circuit noted that extinguishment of Indian property interests "cannot be lightly implied in view of the avowed solicitude of the Federal Government for the welfare of its Indian wards." *Id.*at 1068 (*citing United States v. Gemmill,* 535 F.2d 1145, 1147 (9th Cir. 1976). The Court must therefore construe the patent and the reserved mineral estates in favor of the United States, the Crow Tribe, and their lessees.

As stated above, the patent to the Property was issued pursuant to the Act of June 4, 1920, which authorized the issuance of patents on the Crow Reservation, reserving the minerals to the United States for the benefit of the members of the Tribe. Although that Act did not expressly state that the mineral owner could use the surface for mineral exploration and production, it did specify that the minerals could be "leased for mining purposes." 41 Stat. 753.

In *Kinney-Coastal Oil Co. v. Keiffer,* 277 U.S. 488 (1928), the Court reviewed the Mineral Leasing Act of 1920, and earlier legislation wherein Congress addressed the development of federally owned minerals. The Court concluded:

> The acts of 1914 and 1920 are to be read together-each as the complement of the other. So read they disclose an intention to divide oil and gas lands into two estates for the purposes of disposal-one including the underlying oil and gas deposits and the other the surface-and to make the latter servient to the former, which naturally would be suggested by their physical relation and relative values. The act of 1914, in providing for the disposal of the surface, directs that there be a reservation of the oil and gas deposits, 'together with the right to prospect for, mine, and remove the same,' meaning, of course, the right to use so much of the surface as may be necessary for such operations. And the act of 1920, in providing for the leasing of the oil and gas deposits, provides (section 29) for a reservation of the surface 'in so far as said surface is not necessary for the use of the lessee in extracting and removing the deposits.' *In effect therefore a servitude is laid on the surface estate for the benefit of the mineral estate to the end, as*

*the acts otherwise show, that the United States may realize,*
*through the separate leasing, a proper return from the extraction*
*and removal of the minerals.*

*Id.* at 504 (emphasis added).

Although the language authorizing the issuance of the patent here is less clear, the same conclusion must be reached, given both the general rules of statutory construction and the absence of any authority supporting a contrary interpretation.

In 1910, the Coal Lands Act had opened withdrawn coal lands to agricultural entry, reserving all coal to the United States together with the right to prospect for, mine, and remove the minerals. 36 Stat. 583 (codified at 30 U.S.C. § 83). Members of Congress, while debating the Coal Lands Act, engaged in the following colloquy:

> Mr. Ames: Might not the prospectors or miners going in necessarily destroy the entire surface of the homestead?
> ***
> Mr. Ferris: ...[I]f the homesteader does not want to enter the surface for land worth $10 an acre for agriculture that is worth $400 and $500 for coal, with the coal carefully reserved, this Government can very well let him stay off it altogether.

40 Cong. Rec. 6046 (1910). From this exchange, a California federal court more recently concluded:

> That great portions of the surface would be used for mining and related activities was certainly brought to the attention of Congress. A coal company president and a mining engineer spelled out in detail the expansive surface areas needed for mining purposes. A similar notion was recognized in adopting the 1916 Act when it was noted that major portions of the surface might be used in mining and removal and that the patentee could receive no payment except for damages to crops or improvements. The subsequent case law has similarly interpreted the reservation statutes.

*Occidental Geothermal, Inc. v. Simmons,* 543 F.Supp. 870, 876 (N.D. Cal. 1982) (holding that act authorizing the leasing of reserved geothermal resources authorized the use the surface of the property). Other cases are in accord. *See, e.g., Transwestern Pipeline Co. v. Kerr-McGee Corp.*, 492 F.2d 878 (10th Cir. 1972) (holding that the federal mineral lessee's rights prevailed over the surface rights of a pipeline company).[1]

---

[1] In debating proposed surface owner right's legislation, Montana's Senator Metcalf stated that the requirement of surface owner consent could be "legal blackmail." 20 RMMLF-INST 12, n. 258 (*citing* 119 Cong. Rec. 18773 (daily ed. Oct. 8, 1973).

For all the above reasons, the Court concludes that Westmoreland is not required to obtain Peters' consent to exercise the lessee's rights given to Westmoreland by the United States and the Crow Tribe.

## C. SMCRA Does Not Require Contrary Result

The primary thrust of Peters' argument is based on SMCRA and OSM's implementing regulations. The Court concludes that this argument fails for the following reasons.

First, both SMCRA and its implementing regulations make clear that nothing in the surface owner protections are to be construed as increasing or diminishing any property rights. *See* 30 U.S.C. § 1304(g); 30 C.F.R. § 778.15(c). As earlier noted, these "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).

Additionally, while surface-owner consent generally is required by 30 U.S.C. § 1304(c), this section does not apply to Indian lands. 30 U.S.C. § 1304(f) ("This section shall not apply to Indian lands").

The definition of "Indian lands" is found in 30 U.S.C.A. § 1291(9):

"Indian lands" means "all lands, including mineral interests, within the exterior boundaries of any Federal Indian reservation, notwithstanding the issuance of any patent, ... and all lands including mineral interests held in trust for or supervised by an Indian tribe."

It is undisputed that the Property is located within the Crow Indian Reservation as it was defined by the Second Treaty of Fort Laramie, May 7, 1868. 15 Stat. 650; *Court Doc. 36* at 2-3; *Court Doc. 38* at 2. The Property is therefore "within the exterior boundaries of any Federal Indian reservation." 30 U.S.C.A. § 1291(9). It is also undisputed that the minerals are held in trust for the Crow Tribe. *See Court Doc. 36-1* at ¶ 1; *Court Doc. 45 at 2, ¶ 1*. The Property is therefore within "Indian lands" as contemplated by §§ 1291(9) and 1304. Because the Property is within Indian lands, § 1304's protection and its requirement of surface owner consent do not apply.

Peters mistakenly argues that "at the time of the enactment of SMCRA, *no* provision other than 30 U.S.C. § 1300 applied to Indian Lands" and therefore Congress did not originally intend to except

Indian lands from the surface owner protection. *Court Doc. 44 at 7* (emphasis in original). Section 714 of SMCRA included the language that was later codified at 30 U.S.C. § 1304(f). *See* Pub.L. 95-87, Title VII, Sec. 714(f). Congress therefore clearly excepted Indian lands from the surface owner protection provisions in SMCRA.

In 1984, OSM promulgated regulations for surface mining on Indian lands. 49 Fed. Reg. 38462-01 (September 28, 1984). These regulations were adopted to provide "for the regulation of surface coal mining and reclamation operations on Indian lands and constitute[] the Federal program for Indian lands." 30 C.F.R. § 750.1. *See also* 25 C.F.R. § 211.5. The regulations regarding permitting specifically incorporate parts applicable to other lands, including Part 778. 30 C.F.R. § 750.12. Part 778 governs "Permit Applications" and the "minimum requirements for legal, financial, compliance and related information." 30 C.F.R. § 778 (2011). It is questionable whether this Part is relevant here, particularly where Westmoreland's permit has already been issued. *See Court Doc.* 43-1 at 2, ¶ 4.

Peters nonetheless relies on subsection 778.15(b) for his argument that surface owner consent is required. That section, however, only applies where "the *private* mineral estate to be mined has been severed from the private surface estate." 30 C.F.R. § 778.15(b) (emphasis added). Peters does not explain why that section would apply in this case in which the United States holds the minerals in trust for the Crow Tribe.

Even if this regulation did apply here, it would not allow the Court to grant Peters' motion for summary judgment. According to § 778.15, which implements 30 U.S.C. § 1206(b)(6), there are three ways that a permit applicant with severed mineral rights can show the right to enter the surface estate: (1) written consent from the surface owner, (2) a conveyance that "expressly grants or reserves the right to extract coal by surface mining methods," or (3) if the conveyance does not expressly grant the right to extract the coal by surface mining methods, "documentation that under applicable State law, the applicant has the legal authority to extract coal by those methods." 30 C.F.R. § 778.15(b)(1)-(3).

If this subsection were held to be applicable, Westmoreland would

have a right of entry under subsection (3) above.  Under Montana law,

mineral interest holders have a right to enter and reasonably use the

surface as necessary to exercise their mineral rights.  *Pinnacle Gas

Resources, Inc. v. Diamond Cross Properties, LLC*, 349 Mont. 17, ¶29

(2009)(*citing Western Energy Co. v. Genie Land Co.,* 195 Mont. 202, 208,

635 P.2d 1297, 1301 (1981) (enjoining surface owner from interfering

with activities of mineral owner because strip mining was within the

contemplation of the parties at the time of the mineral reservations)).

The holders of a mineral estate have the dominant estate under

Montana law.  *Hunter v. Rosebud County*, 240 Mont. 194, 198 (1989)

("Their assertion that the mineral estate and the remaining estate are

of equal dignity is not correct.  The general rule is that the owner of the

mineral estate enjoys the dominant estate and the surface owner of the

remaining estate holds the subservient estate.  This theory is based

upon the realities that accompany mineral exploration and

development.  Obviously, in order to fully utilize a mineral estate, one

usually must have access to the surface.").  See also *Burlington*

*Resources Oil & Gas Co., LP v. Lang and Sons Inc.*, 361 Mont. 407, 412 (2011).

The letter from OSM to Westmoreland directing that Westmoreland not disturb the surface of the Property "until a right-of-entry is obtained and submitted to OSM for review and approval" (*Court Doc. 44-1*) does not alter the settled law discussed above. The letter does not state that the required "right-of-entry" must be in the form of landowner consent. A judgment from a court of competent jurisdiction also can establish such right-of-entry.

The Court recognizes that this is a harsh result for Peters. But it also finds that the applicable law has been clear for many years, including when the Property's patent was issued. To hold otherwise, would essentially have the "effect of vesting in the surface owner a co-ownership right in the mineral resources. ... [T]he surface owner's right to royalties or a right to exclude was never contemplated by any of the agricultural entry laws." *Occidental Geothermal, Inc. v. Simmons*, 543 F.Supp at 877.

The Court also determines that this matter is ripe and may properly be addressed at this time. Westmoreland seeks a declaration relating to the extent of its rights as the lessee of severed mineral interests. Peters disagrees with Westmoreland's position that Westmoreland may proceed without his consent. As the Court earlier recognized, OSM may not determine property rights. 30 U.S.C. § 1260. The issue is fit for judicial decision and withholding court consideration may work a hardship on the parties. *See Stolt-Nielsen S.A. v. AnimalFeeds International Corp.,* 130 S.Ct. 1758, 1767 n. 2 (2010).[2]

## D.    Damages

In its Motion for Partial Summary Judgment, Westmoreland also seeks a ruling that it must "reasonably compensate the surface owner for the loss of use and/or damage to the surface estate up to a maximum amount equal to the market value of the surface estate." *Court Doc. 34 at 2.* In its brief in support of this motion, Westmoreland cites authorities addressing what a mineral owner may owe to the surface

---

[2]The Court has considered Peters' remaining arguments and, based on the controlling authorities discussed above, find them to be without merit.

owner.  *Court Doc. 35 at 21-26.*  In his responsive brief, Peters did not

address the compensation issue.

Having reviewed the issues that the parties agreed would be

addressed in "Phase I" of this action, the Court finds it inappropriate to

address the damages issue at this juncture.  The Court's order provided:

> Phase I will be limited to the following topics: (1) Whether the
> Crow Tribe has the right to mine coal by the open pit method
> property in which Peters owns an interest if Peters refuses
> refuses to consent to the mining; (2) Whether any State of
> Montana mining or reclamation laws apply within the boundaries
> of the Crow Reservation and, if so, (3) Whether the Crow Tribe is
> precluded from mining if Peters refuses to approve the
> Reclamation Plan.

*Court Doc. 25 at 1-2.*  The parties did not agree that the issue of

recoverable damages would be addressed at this juncture and therefore

the Order did not so provide.  For this reason, the Court will deny this

portion of Westmoreland's motion, with leave to renew.

## IV.  CONCLUSION

For the foregoing reasons, IT IS ORDERED that the Plaintiffs'

Motion for Partial Summary Judgment (*Court Doc. 34*) is GRANTED IN

PART, in that the Court has determined that the Crow Tribe, and by

extension its Lessee, has the right to mine coal underlying the Peters

Property without the surface owner's consent.  Defendant's Motion for

Partial Summary Judgment (*Court Doc. 37*) is DENIED.

IT IS FURTHER ORDERED that the parties shall participate in

a status conference with the Court at the James F. Battin Federal

Courthouse, Billings, Montana, **on Tuesday, January 10, 2012, at 10**

**A.M.,** for the purpose of identifying the remaining issues and putting in

place a schedule for addressing them.

DATED this 19th day of December, 2011.

/s/ Carolyn S. Ostby
United States Magistrate Judge